Good morning, ladies and gentlemen. Our first case for this morning is Steimel v. Wernert. Mr. Rose. Thank you, Your Honor, and may it please the Court. As a result of the policy change at issue in these cases, the named plaintiffs, as well as hundreds of other persons, have lost their ability to enjoy the benefits of the library, or the park, or the gym, or to go out to eat, or go shopping, or to engage in a wide range of other activities, has been severely restricted. In terms familiar under the ADA, they are no longer able to interact with non-disabled persons to the fullest extent possible. Mr. Rose, before you get deeper into your argument, I do have one question that I'd like to pose to you, and it's this. What were the specifics of the U.S. government's position below, and why hasn't the government weighed in on appeal? Your Honor, I can't speak as to why the government did not weigh in on appeal. The government, I believe, saw the state's brief interpreting Amundsen as precluding significant or at-risk claims, and it felt a need to weigh in on that issue. The government has not expressed a position as to our home-based segregation claim, but its position below was that the state's action violated the ADA insofar as it placed the plaintiffs at risk of actual institutionalization. Thank you. So I have a broad question for you. Your opponents understand your argument essentially to be one that a different package of services should be given to your clients, whether your clients are the individual clients of the class, let's not worry about for right now. You aren't phrasing it quite that way. You seem to be saying, as I understand it, that under the law, well, let me put it this way, that there's nothing in any of the governing statutes or regulations that limits the number of settings to simply two, institutional being one, at home being another, and that you're putting a setting-based argument, which is a community setting, maybe an adult daycare center or a library or somehow or another something that gets people out of the house into the broader community, some intermediate point, I suppose. So is that a fair characterization of your argument? Because I would have great concerns if it was just about the package of services. No, Your Honor, I think that's very true. We've never disputed that the integration mandate concerns the setting in which services are offered. The parties have all have obviously gone back and forth over whether there are circumstances in which the mandate can require a state to provide additional services, and we've disagreed on that, but at least for the home-based segregation claim, the relief we're seeking is exceedingly narrow. I don't read the state's brief to dispute that the mandate is implicated in cases such as the Lane case out of Oregon, where a state chooses to offer services in a segregated setting, but does not offer services in an integrated setting, even when the actual residence does not change. And viewed in that light, our claim on the merits, at least again so far as our home-based segregation claim is concerned, is very simple. The fact that it continues to provide services to the named plaintiffs and presumably the class in their homes and simply fails to offer a community-based alternative. So have they ever, I mean, is it your view that when they were, when your clients were under this A&D waiver, that they were getting, at that time, community-based services? There are all these different programs, of course, that the state can take too much shelter in that, but in any event, they were getting community-based services. And as far as you, does this record show that the community-based services were, I'll just say, cost-neutral? That they weren't costing any more than institutionalized services would have been? Cost neutrality for the A&D waiver under the Medicaid Act is determined on an aggregate basis, and I think the facts are very clear that at least system-wide, while the plaintiffs were on the A&D waiver and receiving community care, certainly the agency has never taken the position that providing that to them can't cost, excuse me, cast cost neutrality into doubt. So let me ask you this, with the A&D waiver, the state says, look, you know, we were using the A&D waiver, but that's really only supposed to be for people who need nursing home level services. This group of people are in the intermediate care level. Where are those terms defined, and were your clients getting more than intermediate care level services under the A&D? Your Honor, I'm not positive that there is a good definition of those terms. The state has taken the position that persons with intellectual disabilities cannot meet, can never meet nursing facility level of care unless they also require nursing assistance, essentially the type of needs such as suctioning or oxygen. I don't know. Honestly, I do not know where that comes from. How does a court decide whether a particular level of participation in the community would be sufficient to satisfy the integration mandate? In other words, is a once a week outing enough? Does it have to be every day? Is it measured from some baseline? How do we know? Sure, Your Honor, and I think that gets into the state's limiting principles argument. I think all such claims have to be evaluated through the community. Few people want to go into the community at 2 in the morning. There are certainly circumstances where professionals might say you're not appropriate for that. And beyond that, the state can always say that providing more community-based care is going to create a fundamental alteration or it cannot be reasonably accommodated. The guidance published by the DOJ, which we cited to the court and is in the record, indicates that the mandate's command means that persons must be offered access to community activities and opportunities at times, frequencies, and with persons of an individual's choosing. So we've never disputed that the plaintiffs have some access to the community, but the integration mandate says most. It says the fullest extent possible, and no more than you or I would be okay if we were only able to leave our houses for one or two days a week. The family supports waiver essentially caps an individual's personal care services at about 10 to 12 hours a week. That's giving the plaintiffs an opportunity to go out of the house two days out of every single week, and I think the command of Olmstead and of the ADA is far more broad. So that's what the $16,545 will do, because the state says these prior authorization waivers take care, or services, not waivers, prior authorization services take care of the in-home needs of the person, and so the $16,545 is left over for whatever, which could include community-based. Sure. When you do the math, that's approximately what the $16,000 comes out to is about 12 hours a week. I don't think the state is suggesting that you simply keep a waiver provider on call for if you feel like going out in the community, if the mood strikes you at 2.30 on Thursday. Obviously there are some very pragmatic problems with saying you only want to go out to the library or the park 12 hours a week, because providers can't just funnel in and out like that. So what we have is we have people, and the named plaintiffs are essentially confined to their own homes during weekdays when their providers are working. Mr. Mertz gets out slightly more than that, but the Coles and the Beckhams, they spend 40 hours a week during normal times when people are out and about, confined to their own homes, receiving these home-based services. And I don't think the state can say under the integration mandate that even though you want to go out during these times, we're going to limit you to this this home-based type of care. We agree that the integration mandate is about setting. It's simply setting in a broader sense than institutionalization versus non-institutionalization. Well, you're saying it's non-binary, yeah. The Coles, Mertz, and Michael Beckham all transitioned to the FS waiver in early 2013, yet they all remain in their homes. Isn't that a sign that they are not really at risk of institutionalization? And Your Honor, that of course gets into our at-risk claim, which is separate from our home-based segregation claim. I don't think it is. I think at-risk, so far as the ADA is concerned, I think it has a more broad definition than that, and deterioration over a lengthy period of time can satisfy the elements of an at-risk claim, even if you're not immediately going into an institutionalization. The Coles, for instance, have both suffered dangerous falls while unsupervised on the family supports waiver. The Beckhams and the Coles, their providers have been providing resources in order to ensure their continued supervision, which the record reflects cannot be done forever. I think the bottom line, so far as our at-risk claim is concerned, is that the state made a determination when they were on the A&D waiver that a certain amount of services was necessary in order for them to remain safely and securely in the community, and I don't think the state can say at this point that a lesser amount of services, and we're talking about 40% cuts or something in that range, is going to be, is going to satisfy the requirements even for an at-risk claim. So can I just get a more specific point about that? The state says just because we were giving you everything under the A&D waiver doesn't necessarily mean that you needed all of it or that it's appropriate under the FS waiver. We're not talking about CIH right now, and that's because the A&D waiver covered up to a much higher level of services. That's why I asked about what specifically do we know about the difference between nursing home level and intermediate level, but you're saying, I guess, that you can somehow in this record dig in to the services that these individual people were getting and say, well, you know, this person needed suctioning, or this person needed a wheelchair attendant, or this person needed whatever else they were getting. Your Honor, the state makes that point, and in doing so they simply recite the services available in the different waiver programs. As we noted in our briefing, though, the vast, vast majority of persons who, at least our members of the class here, who don't have that skilled need, were receiving changes that are virtually interchangeable between the two, be it respite care services, which are available through both waivers, or personal assistance and care versus attendant care, which are defined in very, very similar terms. Certainly we agree that there are some people who may have been receiving additional services through the A&D waiver above that $16,000 limit who are not in the plaintiff class. The state brings to mind the person who received so many services because they needed a one-time home modification. That person very likely is not a class member, but for the vast majority of class members, I think they're using the same types of services. But before you leave the topic of the class, the state argues, and the district court found, and I thought, you know, potentially rationally so, that even in order to know who's in the class, you have to have such a detailed assessment of each person, each person's needs, and the like, that this is simply not suitable, whether you want to call it commonality, or whether you want to call it typicality, you know, 23A gets at these things in a number of different ways. So I'd like you to comment on that. Sure, Your Honor, and obviously we disagree. We have recommended that, and we did so in trying to determine the number of class members, but we've recommended that the amount of services they receive through the A&D waiver be used as a guide host for determining their actual needs. But doesn't that take you away from what you were just saying, that it was a setting-based theory that you have? Because if we start toting up amounts of services, I think you fall into the trap of this simply being, you know, you needed a ride to the library, and somebody to sit there with you twice a week, and somebody else needs, you know, a specialized wheelchair with a computer on it, they've got CP, or what have you. Your Honor, I don't think there's anything wrong with using a factual determination about what person's needs as a shorthand for determining what persons actually need. But they're gonna be so different. How do we have a class that's coherent? Your Honor, if that's true, there's no such thing as an Olmstead class. There's no such thing as a class under the Medicaid Act, and obviously that's not so. What we have is the state imposed a generally applicable policy in 2011 that has undeniably been enforced against hundreds of persons. To the extent, to the extent that we're looking at, I'll say, the ease of identifying class members, that's precisely the inquiry that this court rejected in Mullins. But we didn't say we should do it if it's impossible either, you know. I mean, there's an overall inquiry, and the Supreme Court has been telling us, be careful about the classes you identify. Your Honor, if when the state imposed this policy, if it had kept a running tally of persons who were being cut off of the A&D waiver, which it did not do, who it had determined required more than that $16,000 amount in services, I don't think there would be any doubt that we could start with that tally as a determination as to who's in the class. And I don't think 23A or B2 depends on the fact that the state did not bother to keep track of the persons that were affected in the same way by the policy that it imposed against the classes. I know you're in your rebuttal, but I really am confused about one fact issue with the plaintiff Thomas Mertz, and that is that apparently his sister's new employer has informed her she's not permitted to take him to the community when, you know, she's being paid to provide him services through the waiver program. Is this a rule from the waiver program or from the provider? Ms. Kemp provides services to her brother four days a week. Two of those days are home health services, where it is the agency's rule that she can't go out with him. Truth be told, certainly there's nothing in the record beyond her saying that her employer won't let her take him out during the other days, that says she can't take him out during that time. The state has said that this is a provider issue. I don't really have a reason to disagree with that. But, so in other words, are you saying that a provider can make such a rule without violating the integration mandate? I don't know that the integration mandate applies to the provider. Certainly there are issues that will need to be addressed with that if there's a remand. Thank you, Your Honor. Thank you, Mr. Rose. General Fisher. Thank you, Your Honor. May it please the Court. Mr. Rose mentioned something that I think helps to shed some light on where we think the flaws are here, which is the idea that there needs to be more money provided. They were getting more under the A&D waiver budgets than they are now, because there's no caps to the A&D waiver budgets, and to reduce the amount of benefits somehow, you know, it causes an injury. If that's the nature of the claim, that really boils down to, number one, either a medical necessity claim, which doesn't fit with an integration mandate, or it seeks to turn integration mandate into a claim of absolute rights of some minimum level of benefits, which this Court in Munson said is not permissible. Right, so let me ask you one thing that's been puzzling me about this. The same person is going to have a need taken care of only once, so to speak. So if a person needs to be in the company of an adult attendant, they're either going to be in the company of an adult attendant at home, or they might be in the company of an adult attendant at some adult daycare center or library, or in the, you know, a park program, or what have you. So I don't understand, if there's an integration mandate, reminds me a little bit of the Individuals with Disabilities Education Act, where we try to mainstream the children, and we say, you know, don't isolate them off, you know, in some specialized program. Why the dollars couldn't, why one couldn't just say to the state, you know, make the dollars balance out, you know, give them enough money so that they can be exercising their rights in a community setting, if that's what they want, as opposed to functionally on house arrest, which seems to be where they are now. Okay, well, no, I think that it's not an accurate characterization. They are getting out, of course, into the community under the current circumstances. A little bit, though. I mean, they're stuck there. I have this image of them in some dark living room, you know, four days a week, all day long, unstimulated and uncared for. Well, let me make a couple of points, one of which is that the entire idea behind the Family Supports Waiver is that they are more appropriate in the home with the family supporting them and the other natural supports that they have, as opposed to an ordinary sort of typical traditional institution. So there is... I get that, and that's where I wondered why it is we have this binary thinking. If the world is composed exclusively of a home and some institution, obviously the state of Indiana, like most other states, has said, no, we're gonna get the waivers, we're gonna facilitate home-based services. But where does that binary structure come from? Why isn't a community-based, you know, daycare, day sort of service, a third setting that's available? Well, it is if there's a discrimination at issue. So for example, the sheltered workshop cases, even the case where somebody was a student at lunch and they were required to go into a separate room as opposed to sitting with the other students. Those kinds of discriminations out in the community, I think, are cognizable. But not here, where we have sort of an endless search for more community as per the definition of the individual beneficiary. You know, why is four or eight hours a week sufficient? Why isn't it 10 or 20? Well, each individual plaintiff in all these cases would have some capacity to say, no, I want more. I want to have, in fact, I need a bigger budget because the place where I can get the most community is farther away. And to get there and to have more people around me in a bigger shopping mall as opposed to one that, you know, has fewer people in it, to have that community setting, I need more services. There would be no... But Amundsen would certainly rule that out. Because Amundsen says, you know, you found something better doesn't mean that what you're being offered by the state isn't good enough. I think that applies here just as much. I mean, we have the determination that this is the most appropriate waiver. And let me, let's bear in mind, to the extent that there is some change in circumstances, whether it's the provider that can no longer provide services or there's a substantial health deterioration, there is the CIH waiver which, like the A&D, has no cap. And eventually that could become a possibility. So there is a point of view. You see, in the briefs, you claim that the decision to use funds to interact in the community is the participants' decision. But if you reduce the amount of funding severely, then it would seem to be a foreseeable outcome that outings into the community are going to be cut, as opposed to food or assistance, dressing, toileting, walking, you know. And that's what is worrisome for me. Well, I think the concern is that if we worry about it relative to where a services is essentially a violation of the integration mandate, which again I think Amundsen says is not the way to look at the integration mandate. There's interesting, I think, way to think about this is I'm not sure the A&D waiver is a good place to start for any number of reasons with plaintiffs' claim. I mean, take the Coles, for example. Their overall budgets now are bigger than they were under the A&D waiver. And what the plaintiffs say is they need more money now. So isn't one of the problems the fact that these prior authorization services are rigidly limited to the home? If somebody really just had a budget, call it, I don't care what you want to call it, $20,000 something, $25,000, and they could allocate those dollars for out-of-the-home versus in-home and come up with the best solution that that budget will support for them. You might be in a different position, but because we've carved off, you know, the prior authorization services and said, no, you know, that's just going to be in the home, dollars that the state has, that the state is spending, aren't necessarily being used in the most integrated way possible. Well, but I think what that leads to is the idea that everybody can essentially craft their own waiver. That I've got this particular mix that I need and I don't fit within either traditional Medicaid or FS or CIH or any of the others, so I need a particularly tailored, you know, waiver that's specific to what I do. And that's not, again, what's required, I think, under the integration mandate. We have, part of the reason that the focus tends to be on the big institutions versus the home as opposed to the home, you know, versus other community settings, is that historically the whole point was to get, you know, people into the home where their natural supports can be. And we are achieving that systematically through a Well, that's right, that's right. And I mean, I think in many ways we can look at the integration mandate and say, gosh, what an overwhelming success it has been in that regard. Well, are you talking, I mean, are you talking about CIH waiver or the FS waiver when you say? Well, all of them. I mean, A&D, FS, CIH, they serve different populations with different needs, all of which enable many people to be at home as opposed to in a large institution. So are you saying, let me just get this straight in my head, you're saying that the state can't provide benefits to these plaintiffs under the A&D waiver because they're not eligible recipients, but you're saying that the state could offer the same additional community-based services through the CIH waiver or the FS waiver? Is that what you're saying? Well, each waiver targeted to a different population. Let me give you a case in point. FS waiver is particularly well suited to these plaintiffs as opposed to A&D because of the array of services that it offers. And can you define intermediate level care for me? Not offhand, I think it's in the state is making such a big deal that the A&D waiver is nursing home level and these people are somehow intermediate. I think it's a need for skilled nursing. I think that's what it boils down to. And that we don't have the need for skilled here, we can have non-skilled nursing and attendant care. And it makes available an array of choices for community habilitation, for example. The idea that you can pick services as somebody on the FS waiver that will develop you as a person in the community, which may not be suitable for somebody on the A&D waiver. Recreational services, music therapy services, these are not available on the A&D waiver. There are choices available under FS because it's a different population. So there's a concern about a mismatch, I think, if we were to assume that somehow A&D was ideal for all of these plaintiffs. It wasn't. How did it happen that these recipients who were ineligible for the A&D waiver, how did it happen that they were given one in the first place? There was a policy determination in 2006, I wish I knew the history, I simply do not, about why that decision was made and then it was reversed in 2011. The idea being we made a mistake, the waiver never should have encompassed this population. It's more appropriate for them to be on the FS waiver. But you know the implication of your argument to me is that if the state of Indiana had, you know, three, four, whatever number of waiver programs, and it defined each one of them in a way that does not allow integration into the community, then that's just tough luck for the plaintiffs. And I can't believe that that's legally correct given the ADA's integration mandate. So the state can't box itself into a corner with these waivers and just say, well, you know, too bad, we can't integrate people into the community, we can't do this because we haven't created a waiver program that would allow it. Well, I think the part of the understanding has been that integration is being achieved when the person is in the home because of the natural supports. And if the natural supports are not there to supplement both the waiver services and the traditional Medicaid services, then that situation may not be appropriate. But the idea that they are in the home is understood to be part of the integration. Now if that changes, if that is not the law, it makes it very difficult to predict what it is exactly that a state is supposed to do. What is an appropriate waiver? Is it that we have to craft individualized, essentially waivers for everybody that comes along to maximize to their, you know, desired expectation what that community integration is going to look like? But you individualize anyway in that each person, as I understand it, gets a plan. Somebody from the state, some case manager sits down, again a little bit like these individualized education plans, but in this instance a plan. So someone is sitting there saying, you know, you probably do need to stay in your living room all the time, but person B is going to be able to benefit, as you said, you know, maybe from the music therapy program or from one of these animal therapy programs or whatever. There are all kinds of interesting programs out there. So why isn't that exactly where the individualization concern is fully addressed by the state's system? It's not that there's no capacity to take account of individual circumstances. Surely no, I mean we do. Right, of course we do. But the point is that there are still constraints. It's within reason, it's within a range of permitted and agreed upon services, levels approved by CMS. So it's not that we take everybody and say you can have absolutely anything and everything you want. Of course not, right, because they're budgetary caps. But the question is, you know, again out of this total pool of money you're spending on any given person, you are forbidding them from using some of those dollars for community-based services. First of all, let's bear in mind that the reason that that restriction is there is it's federal regulation as well as state regulation, but these are Medicaid traditional services. They are medically indicated and the restriction is when it's medically indicated it has to occur in the home with some other exceptions not applicable here. We are medically indicated but not at the skilled nursing level. Right, right. So I don't see why medically indicated has to mean, I mean you could be out in the if you needed to have, you know, your esophagus suctioned out from time to time or your windpipe. Well, but we're, FS services are designed for people who are, you know, going to be getting, making choices on these services. The Medicaid is meant to be a supplement. It's meant to say, look, we understand FS is not going to give you everything you need, but here comes Medicaid to supplement all of that. And again, it's, I think the presupposition certainly is that being in the home as opposed to an institution is part of community integration. If that changes, if that goalpost changes, that makes it very difficult to understand what rule that a state has to live by when trying to achieve community integration. But the Department of Justice, and you kind of brush this aside, but even if it's Meade-Skidmore evaluation, thinks that the services... Not with respect to this idea of being institutionalized in the home. They never staked out a position on that. They only said... Should we ask them? Well, it might be interesting to know the answer because I think it sells something that they didn't, they knew that that issue was on the table and they didn't go down that road. So I think perhaps that does reveal something. But the, you know, their only point was, look, we don't think a Munson should be right to say that you have to be in an institution as opposed to at some different issue. I agree with that. So, you know, I think the need for reasonableness, the need for constraint, the idea that the state can have predictable programs that it sets out in advance, it's not going to be ideal for everybody. And that, you know, we we wish we could, right, but we have to live within restraints and we can't have a situation where everybody's allowed to come along and create their own, essentially their own waiver program. We do our best to fit them within the one that's the most appropriate. You know, in the circumstances here with Mr. Meritz, I mean, I think if you had perhaps a different service employer for the sister, that would allow more integration into the community with respect to Mr. Beckham even. There's a choice being made there that, you know, if the sister were not the service provider, if in fact there was a choice that they could make to send Mr. Beckham to an adult day service, that would be more community integration. These are all examples. Suppose the state, forgive me, but suppose this, I'm so afraid your time will be up, suppose the state dollars could be spent for outings outside of the home. Would that violate the integration mandate? Well, I think what, it sounds very extreme, I think what I try to think about in all of this is, is there a discrimination going on? But would that be okay? Are you so confident that the home is a perfect substitute for the broader community that the state could just say, we're not going to spend a penny, you know, if you happen to have a rich relative, great, you know. I don't think it would work, but I don't think it's because the, because it's been reduced to zero. I think because at that point you can look at various service sectors that somebody could get, for example, an institution where they might have some ability to get X service that they couldn't get in a home if we reduce that budget to zero. Well, we've got the Beckhams here. Is it true that they used to go to day services on all weekdays and now they can't enter the community except on weekends? Well, no, but I think that again the choice there is... But that's the fact though, right? With the Beckhams. Because the sister is the service provider. If she were willing... And you know, and her employer probably doesn't want the liability of her driving downtown. It's the only thing I can think of that would cause this rule. Well, let's not converse, that's the mayor, that's Mertz, that's Mertz. Let's not confuse the two. Mertz is the proprietor. Beckham, it's simply, look, if you know, if you would say I'm not going to be the provider every time and I'm willing to take my brother into the community at an adult day service, they could get more time in the community. So there are choices being made and I think the district court observed that. That, you know, there's not only are these issues about where, you know, what's integration or what's not, but what's the causation? What's really being done here with respect to these individual plaintiffs? And they are making choices. But don't we know... Go ahead, Mike. Maybe you don't know the answer to this question, but how many people does this litigation implicate? I don't have a precise number. I think it's in the hundreds, probably 500 or below is, I think, the general range. So it's not a large, we're not talking about a large. As these things go, I wouldn't think. But yeah, I mean, it's, there's a waiting list to get people from A&D on an FS and we haven't just kicked everybody off that didn't qualify for A&D. There's a transition process, they remain on A&D until a spot opens up on FS and our waiting list is now, started off at 8,000, it's now down to about 2,000 and we're targeting 300 a month to make the transition. So, you know, there's a system in place trying to take into account the needs of individuals. So what I was going to say is you do know an effective way to transport people to these community services because of all these A&D people in the period before the policy change who somehow, I don't know whether they had a van service or whatever they did, they did something and they were out there in the community. So there is an experiential base in the state as opposed to just saying, gee, you know, we don't know how they'd ever get out there if... No, no, but I think, again, you know, we're talking about a population that in the estimation of the state and CMS both is well suited to a an array of services that will help them in a habilitative sense and it's not simply that they can't get around or, you know, there's, there's family supports to come in and help out with that and that's exactly what the state is supposed to take into account. So there's a real suitability issue here that runs through all of this, that I think it, you know, in the long run makes these, this population better off under the family supports. Nothing further? Thank you. All right, thank you very much. Anything further? Mr. Rose. The state raises a factual issue with respect to the coals that I do not want to just leave hanging out there. In raising this issue, as it did in the briefing, the state is relying on the amount of services actually used by the coals as to, as opposed to the amount used or approved by the state during the one year immediately before their transition between waiver programs. The facts are undisputed that during this this time frame their provider was unable to adequately staff the hours. There's no reason to think that that's still going on at this point. And on top of that, at the same time, one of the brothers moved outside of the home to increase his independence. I don't want to let that go unsaid. The state spends a lot of time discussing the outer bounds of our argument in this case, and I just, I want to underscore one more time exactly how narrow it is, the relief we're seeking is, is or can be. I think the state digs its own grave by admitting that the integration mandate is implicated when you talk about sheltered employment services, which were at issue in the Lane case. I don't think there's a practical difference between that case and this case when you talk about home health services versus community-based services. The bottom line is that the court, in reaching the decision that it did in Olmstead, viewed non-institutionalization not in, not as an end in itself, but as a way to ensure that people have access to everyday life activities, and I'm quoting here, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment. That is rendered meaningless if people can be confined to their own homes the vast majority of each week. Thank you. All right, thank you very much. Thanks to the state as well. We will take the case under advisement.